*26 OPINION OF THE COURT
Barry M. Donalty, J.
On November 19, 1996, the defendant was convicted by jury verdict of six charges including murder in the first degree in violation of section 125.27 (1) (a) (vii) of the Penal Law.
The proof presented at trial was overwhelming. Essentially the evidence showed that on January 30, 1996, the defendant and his girlfriend agreed to rob the victim, Alexander Ajaeb. Felicia West, the defendant’s accomplice girlfriend, was to entice the victim into his liquor store that early morning with the promise of sex, and then the defendant would enter the store and by force steal the victim’s money.
Felicia West succeeded in getting Mr. Ajaeb to open up his store, and she followed him inside. The defendant entered the store behind them, and without hesitation began to strike Mr. Ajaeb with a baseball bat. The attack upon Mr. Ajaeb was a particularly brutal and savage one, and so immediate that the victim was unable even to defend himself. The forensic pathologist, Dr. Barbara Wolf, testified that there was a minimum of four to five separate blows which struck the victim’s head and face with devastating force. Each blow resulted in a separate, identifiable injury to the head and face. The victim died as a result of multiple blunt force traumatic injuries.
After killing Mr. Ajaeb, the defendant stole money from his person, as well as money, liquor and other items from the victim’s store.
The defendant was 18 years old on the date of the crime.
The jury determined that the defendant intentionally killed Mr. Ajaeb during the course of a robbery, and convicted him of murder in the first degree, as well as two counts of murder in the second degree, two counts of robbery in the first degree and one count of robbery in the second degree.
It is the responsibility of this court to sentence the defendant in accordance with section 70.00 (3) (a) (i) of the Penal Law. That section sets forth the range of the sentence for the murder in the first degree conviction, with the minimum being 20-25 to life, and the maximum being life without the possibility of parole.
The New York State Legislature on March 2, 1995, in representing the will of the People, passed legislation creating a redefined crime of murder in the first degree, which authorized the imposition of the death penalty. (L 1995, ch 1.) Governor Pataki signed the legislation into law on March 7, 1995, to be effective September 1, 1995.
*27 The new law (Penal Law § 125.27) specifically designates 12 instances in which the intentional murder of another would qualify to be a first degree murder.
These, of course, involve the most callous, heinous types of murders.
Because of the nature of these designated factors which elevate a homicide to murder in the first degree, the Legislature heightened the punishment upon conviction.
Included in the enhanced sentencing, of course, could be the imposition of the death penalty. (See generally, CPL 400.27 [11] [d].)
In this case, where the District Attorney chose not to seek the death penalty, the statute, nonetheless, calls for an enhanced sentence upon conviction, that is, life without parole or life with a minimum of 20-25 years. (Penal Law § 70.00 [3] [a] [i].)
It is that decision that confronts this court.
Given the gravity of that decision (particularly in light of the age of this defendant), this court determined that a hearing consistent with one required pursuant to CPL 400.27 would be prudent, and in the exercise of its discretion, ordered the same.
The court determined that in order to impose the appropriate sentence, it should be provided the same information which would be available to a jury in their decision as to whether the death penalty was the appropriate sentence. (See generally, CPL 400.27.)
The statute does not require such a hearing. In fact, CPL 400.27 (1) states that the separate sentencing proceeding shall. not be held when the death penalty cannot be imposed.
Nevertheless, this court decided it should provide to both the prosecution and the defense the opportunity to present any aggravating and mitigating circumstances which they felt the court should consider before imposing sentence.
There is a mechanism in place for such a proceeding, and that, of course, is the penalty phase proceeding under CPL 400.27. This section provides a structure to the proceeding, and sets forth what aggravating and mitigating factors may properly be considered before an enhanced sentence may be imposed. (CPL 400.27 [7] [a], [b]; [9].)
In order to be fair to each side, I required that they follow the procedures and restrictions imposed under CPL 400.27.
*28 There are those who would, argue that the conduct of this proceeding was unnecessary, and an inefficient use of judicial resources.
I obviously disagree. And I suspect that there are many who will concur with my position.
This court found instructive of the legislative intent concerning the proceeding ordered in this case, the Assembly Legislative Memorandum which accompanied the death penalty legislation.
That memorandum, as relevant to this case, addresses the issue and provides as follows:
"The statute does not provide any explicit standards to guide a court in making a determination between a sentence of life imprisonment without parole CLWOP’) or a regular life sentence * * *
"The provision of Section 400.27 defining aggravating and mitigating factors a jury must consider at sentencing should provide comparable guidance to courts * * *
"The Court should also consider any of the mitigating factors specified in subdivision (9) of Section 400.27 for which the defendant presents evidence or argument, and pursuant to the statute, review both aggravating and mitigating factors prior to making a sentencing determination. A presentence investigation and report should also aid the court in making its decision." (Assembly Codes Comm Mem, Bill Jacket, L 1995, ch 1, reprinted in 1995 NY Legis Ann, at 1 [emphasis added].)
Although not reflected in the statute ultimately enacted, the Legislature contemplated that a hearing such as the one ordered in this case would be wise, and would allow the defendant to present "evidence * * * pursuant to the statute". Evidence, of course, can be in the form of testimony from a witness and in relevant exhibits. And certainly CPL 400.27 contemplates the testimony of witnesses, and thus the reference in the legislative memorandum that the court review aggravators and mitigators "pursuant to the statute” is particularly compelling.
It is for the foregoing reasons that this court ordered a hearing consistent with the provisions of CPL 400.27 in this case.
Prior to the commencement of the hearing on March 12, 1997, the defendant moved to set aside the verdict pursuant to CPL 330.30 based primarily upon two grounds.
The defendant alleged that the jury verdict was against the weight of the evidence, and with regard to the murder in the *29 first degree conviction that the defendant was 18 years of age and thus Penal Law § 125.27 (1) (b) would prevent his conviction since he was not "more than eighteen years old at the time of the commission of the crime.”
As indicated earlier, this court finds the evidence of the defendant’s guilt to be overwhelming, and clearly supports the verdicts rendered by the jury and denied that branch of the defendant’s motion.
A thornier issue involves the age requirement set forth by Penal Law § 125.27 (1) (b), wherein the People are required to prove as an element of the crime that the defendant was more than 18 years old at the time of the incident.
The People proved at trial that the defendant’s date of birth is July 4,1977, and that he was therefore 18 years old on January 30, 1996, when the crime occurred.
"[T]he rules of statutory construction dictate that words in a statute should be given their natural and obvious meanings according to ordinary usage. (See, McKinney’s Cons Laws of NY, Book 1, Statutes §§ 94, 232.)” (People v Carr, 159 Misc 2d 1093, 1094-1095.)
It is the judgment of this court that given the fact that the defendant had attained his 18th birthday prior to the date of the crime, he was then more than 18 years old as required by the statute. The celebration of the defendant’s 18th birthday concluded his first 18 years of life, and commenced his 19th year of life. Thus, this court determines that the defendant was more than 18 years old on January 30, 1996, and applying the natural and obvious meaning to the words of Penal Law § 125.27 (1) (b) qualified to be prosecuted pursuant to that statute.
The defendant’s motions to set aside the verdict were denied.
At the hearing, the defendant produced four witnesses who provided this court a significant amount of information concerning the defendant, his background and family history. This information was significantly more and in greater detail then would ordinarily be available to the sentencing Judge.
To say that this defendant’s life has been a tragedy would be an understatement.
Dr. Thomas Lazzaro, a licensed psychologist, testified that he examined the defendant on numerous occasions, and administered to him 14 separate tests to measure his intellectual and emotional abilities and functions, as well as to determine whether he suffered any neuropsychological impairments.
*30 Dr. Lazzaro determined that the defendant’s full scale I.Q. was 78, with a verbal I.Q. of 70, and a performance I.Q. of 94. Dr. Lazzaro stated that these results reflect that the defendant is borderline mentally retarded, and that his verbal I.Q. under the prevailing standards demonstrates mental retardation.
The neuropsychological testing performed upon the defendant showed significant brain impairment reflective of organic brain syndrome on the left side of the brain. The left side of the brain controls to a large degree one’s ability to communicate and to understand that which is being communicated to you. Dr. Lazzaro was of the opinion that the organic brain damage suffered by the defendant was most likely caused as a result of fetal alcohol syndrome, given his mother’s history of alcohol use.
Dr. Lazzaro was of the opinion that due to his low intelligence, and organic brain damage, the defendant is not able to relate appropriately within the norms of society.
This is further exacerbated by the incredibly dysfunctional family environment within which the defendant was raised.
The defendant’s mother had five children before she met his father. In the mid-1960’s, the defendant’s mother and father moved from Alabama to Utica, and thereafter conceived four children, including the defendant.
Defendant’s mother is described as of limited intelligence, uncommunicative, prone to the excessive use of drugs and alcohol, and most importantly, unable or unwilling to provide a nurturing environment for her children. She was quite simply overwhelmed by her children, and lacked the ability to provide supervision and discipline within her household. The mother was never employed in any formal sense, and received social services benefits for herself and her children.
The defendant’s father provided no guidance or direction to his children. More often than not, he resided away from his children and out of the home. He, too, is described as uncommunicative and unsupportive to his children and also suffering from a history of alcohol abuse.
When the defendant was four years old, his nine-year-old brother Johnny, to whom he was quite close, was kidnapped and murdered. His body was not found for about a two-month period of time after his abduction.
The loss of his brother in this manner traumatized the defendant, and apparently caused him to fall into a deep depression.
*31 Defendant’s lack of intellectual ability and motivation as well as the lingering impact of his brother’s murder is reflected in the fact that he was required to repeat both kindergarten and first grade. Additionally, all testing done on the defendant, even up to the present, shows that the defendant possesses an intellectual capacity approximately five years less than his age.
Defendant’s scholastic career was checkered at best. Defendant had a difficult time coping with school work, and also with interpersonal relationships with his peers. A review of the defendant’s school records shows that even school district personnel had difficulty in classifying and placing him appropriately.
But, more importantly, the defendant had no home environment which encouraged him to learn, or anyone who would intercede on his behalf with school district personnel.
The physical conditions in the homes in which the defendant lived were also less than desirable. Some of the apartments were dilapidated and rat infested.
In 1991, the defendant was placed by the Family Court with the Division for Youth at the Great Valley Residential Center. In 1992, he was placed at the Tryon Residential Center, and later was referred to the Gloversville Group Home supervised by Division for Youth personnel.
To the extent that it is possible, the defendant was able to thrive in the structured environment supplied by the Division for Youth. A review of the reports from those placements, and the testimony at the hearing, indicates that the defendant progressed educationally, vocationally and socially while in Division for Youth facilities.
And it is just as clear, that once he was released and returned to his home his condition deteriorated. He was constantly truant from school and ultimately began to abuse drugs and alcohol.
In 1994, his stepbrother, Oliver Rogers, with whom he resided in 1989 when his mother was incarcerated for drug possession, was a murder victim in Utica.
Another brother, Eugene Bell, who is four years older than the defendant and with whom he was close, has been incarcerated for most of his adult life for various crimes.
His sister Rosina was placed in a foster home in 1990 for truancy.
*32 In 1995, the defendant’s mother moved to Alabama, leaving her remaining children in Utica. Prior to leaving Utica, she made no arrangements for the care of her children.
In short, the defendant’s home life was a shambles.
In the months prior to committing the crime for which he was convicted, the defendant would occasionally reside with his sister, who is now a single mother with three children.
The defendant had a relationship with two females which resulted in the birth of two children. Both mothers indicate that the defendant provides no support for the children, and that he abused drugs and alcohol on a daily basis.
In late 1995, the defendant began to associate with Felicia West. Their existence has been described as one of getting high and watching television.
This association ultimately led to the events of January 30, 1996, and the death of Mr. Ajaeb.
Dr. Lazzaro expressed his opinion that emotionally this defendant suffers from chronic depression as a result of his organic brain damage, and the environment in which he lived.
Additionally, he is of the opinion that he suffers from post-traumatic stress disorder caused by the death of his brother Johnny when the defendant was four years old.
Dr. Lazzaro expressed his opinion that the defendant is in need of drug therapy to address his depression. He also felt that with drug therapy, training and a structured environment, there is a possibility that he could be rehabilitated.
Given the mitigating factors, that were presented to the court, the defendant seeks the minimum sentence.
The prosecution, on the other hand, recommends the maximum sentence of life without parole relying on the brutality of the crime. The People contend that because of the manner and method of the victim’s death, the defendant has forfeited any right to ever again live within society.
It is with this backdrop that the court will impose sentence upon the defendant on March 24, 1997.